# TAB 4, EXHIBIT 5

⑲ RÉPUBLIQUE FRANÇAISE

**INSTITUT NATIONAL
DE LA PROPRIÉTÉ INDUSTRIELLE**

———

PARIS

———

⑪ N° de publication :     **2 758 459**
(à n'utiliser que pour les
commandes de reproduction)

㉑ N° d'enregistrement national :     **97 00479**

㉝ Int Cl⁶ : **A 61 K 31/22**, A 61 K 9/16, 9/20 // (A 61 K 31/22, 47/32, 47:10)

⑫                    **DEMANDE DE BREVET D'INVENTION**                    **A1**

㉒ Date de dépôt : 17.01.97.

㉚ Priorité :

㊸ Date de la mise à disposition du public de la demande : 24.07.98 Bulletin 98/30.

㊺ Liste des documents cités dans le rapport de recherche préliminaire : *Se reporter à la fin du présent fascicule.*

㉘ Références à d'autres documents nationaux apparentés :

�learned Demandeur(s) : *PHARMA PASS* — FR.

㉒ Inventeur(s) : STAMM ANDRE et SETH PAWAN.

㉝ Titulaire(s) :

㉔ Mandataire : CABINET HIRSCH.

㉝ COMPOSITION PHARMACEUTIQUE DE FENOFIBRATE PRESENTANT UNE BIODISPONIBILITE ELEVEE ET SON PROCEDE DE PREPARATION.

㉗ L'invention a pour objet une composition comprenant (a) un support inerte hydrodispersible recouvert d'au moins une couche contenant un principe actif fénofibrate sous forme micronisée avec une taille inférieure à 10 µm, un polymère hydrophile et éventuellement un tensioactif; ledit polymère hydrophile représentant au moins 10% en poids du poids de l'élément a); et (b) éventuellement une ou plusieurs phase(s) ou couche(s) externe(s).

L'invention a encore pour objet son procédé de préparation §



**FR 2 758 459 - A1**



1

# COMPOSITION PHARMACEUTIQUE DE FÉNOFIBRATE PRÉSENTANT UNE BIODISPONIBILITÉ ÉLEVÉE ET SON PROCÉDÉ DE PRÉPARATION

La présente invention a pour objet une nouvelle composition pharmaceutique présentant une biodisponibilité élevée de par une dissolution supérieure et son procédé de préparation. La présente invention concerne plus particulièrement une composition pharmaceutique destinée à une administration par voie orale, contenant un principe actif de faible solubilité.

De nombreux principes actifs ont pour inconvénient de présenter une solubilité faible en milieu aqueux, donc de présenter une profil de dissolution insuffisant et par conséquent une faible biodisponibilité dans l'organisme après administration orale. La dose thérapeutique devant être administrée doit donc être augmentée pour obvier cet inconvénient. C'est le cas notamment de nombreux principes actifs hypolipémiants, tels que ceux appartenant à la famille des fibrates.

Le fénofibrate est un hypolipémiant bien connu de la famille des fibrates qui est commercialisé à divers dosages (100 et 300 mg, par exemple Secalip®), mais sous une forme conduisant à une faible biodisponibilité du principe actif. En effet, du fait de sa faible hydrosolubilité, le fénofibrate est mal absorbé au niveau du tube digestif et présente par conséquent une biodisponibilité incomplète, irrégulière et souvent variable d'un individu à l'autre.

Pour améliorer le profil de dissolution du fénofibrate et sa biodisponibilité et réduire ainsi la dose devant être administrée, il serait utile d'augmenter sa dissolution de manière à ce qu'elle puisse atteindre un niveau proche de 100%.

*2*

De plus pour le confort du patient, il est avantageux de rechercher une forme galénique ne nécessitant qu'une seule prise par jour qui permette un effet identique à celui obtenu lors de prises multiples.

5      Un procédé visant à améliorer la biodisponibilité du fénofibrate est décrit dans le brevet FR2627696. Ce brevet décrit l'effet de la co-micronisation du fénofibrate avec un tensio-actif, par exemple du laurylsulfate de sodium pour améliorer la solubilité du fénofibrate et augmenter ainsi sa
10    biodisponibilité.    Ce brevet enseigne que la co-micronisation du fénofibrate avec un tensioactif solide permet d'améliorer la biodisponibilité du fénofibrate de façon significativement plus importante que l'amélioration que l'on obtiendrait soit par addition d'un agent
15    tensioactif, soit en micronisant uniquement le fénofibrate, soit encore en mélangeant intimement le fénofibrate et le tensioactif micronisés séparément.    La méthode de dissolution utilisée est la technique classique de la palette tournante (Pharmacopée Européenne): la cinétique de
20    dissolution du produit est mesurée dans un volume fixe de milieu de dissolution, agité par un dispositif standardisé; un essai a également été réalisé avec une technique alternative de la Pharmacopée Européenne, à savoir la méthode de la cellule à flux continu.

25    Ce procédé selon le brevet FR2627696 conduit à une nouvelle forme galénique où le produit actif, co-micronisé avec un tensioactif solide, présente une dissolution du fénofibrate améliorée, donc une biodisponibilité augmentée, ce qui permet, à efficacité égale, une diminution de la dose
30    quotidienne de médicament: respectivement 67 mg et 200 mg au lieu de 100 mg et 300 mg.

Cependant, le procédé de préparation selon ce brevet n'est pas totalement satisfaisant dans la mesure où il ne conduit pas à une biodisponibilité complète du principe
35    actif et il présente plusieurs inconvénients.    La technique de co-micronisation du fénofibrate avec un tensio-actif solide améliore certes la dissolution de ce principe actif, mais cette dissolution reste incomplète.

2

3

Il existe donc un besoin pour améliorer la
biodisponibilité du fénofibrate afin d'atteindre, dans des
temps très courts, un niveau proche de 100% (ou, en tout
cas, supérieur aux limites suivantes : 10% en 5 minutes, 20%
5   en 10 minutes, 50% en 20 minutes et 75% en 30 minutes dans
un milieu constitué de 1200 mL d'eau additionnée de 2% de
Polysorbate 80, avec une vitesse de rotation de la palette
de 75 t/min), et ce même lorsque des milieux de dissolution
à faible teneur en tensioactif sont utilisés.

10   Ce même besoin existe pour d'autres substances
médicamenteuses connues pour leurs faibles dissolution et
biodisponibilité. Des exemples sont des substances de la
même famille que celle du fénofibrate, comme par exemple
gemfibrosil, ciprofibrate, beclobrate, clinofibrate,
15   simfibrate et bezafibrate, mais aussi d'autres substances
telles que glipizide, nifédipine, spironolactone,
griséofulvine, acétazolamide, acide pipémidique, alprazolam,
amphotéricine B, aténolol, azathioprine, zidovudine,
cortisone, econazole, furosemide, ketoconazole, loperamide,
20   lovastatine, mesalazine, sucralfate, tolbutamide,
papaverine, piroxicam, verapamil, etc., cette liste n'étant
pas limitative.

La demanderesse a mis en évidence de façon surprenante
qu'il est possible de résoudre ce problème par un nouveau
25   procédé de préparation d'une composition pharmaceutique par
pulvérisation d'une suspension du principe actif sur un
support inerte hydrodispersible. La présente invention
concerne également les compositions pharmaceutiques ainsi
préparées.

30   On connaît déjà l'utilisation de polymère tel que la
polyvinylpyrrolidone pour la fabrication de comprimés, à des
concentrations de l'ordre de 0,5 à 5% en poids, au maximum
de 10% en poids. Dans ce cas, la polyvinylpyrrolidone est
utilisée comme liant. De même, on connaît l'utilisation de
35   polymère tel que l'hydroxyméthylpropylméthylcellulose comme
liant de granulation. Ainsi, EP-A-0 519 144 décrit des
pellets d'une substance faiblement soluble, l'oméprazole,
qui sont obtenus par pulvérisation sur des pellets inertes,
dans un granulateur à lit fluidisé, d'une dispersion ou

3

suspension de principe actif dans une solution contenant
ledit polymère. Cependant, là encore, le polymère (HPMC et
HPC) n'est utilisé qu'en tant que liant de granulation, en
une quantité d'environ 50% en poids du poids du principe
5    actif, ce qui compte tenu de la présence des pellets inertes
de grande taille (environ 700μm) conduit à des teneurs
finales en principe actif et en polymère très faibles, de
l'ordre de quelque % à peine du poids du pellet final
recouvert. Enfin, on remarquera que la dimension des pellets
10   inertes dans ce document est assez élevée, ce qui dans le
cas du fénofibrate conduirait à un volume final de la
formulation beaucoup trop grand pour une administration
aisée par voie orale.

On connaît aussi l'utilisation de polymère tel que la
15   polyvinylpyrrolidone pour la fabrication de "dispersions
solides", obtenues en général par co-précipitation, co-
fusion ou mélange en phase liquide suivie d'un séchage. Il
s'agit dans ce cas d'une fixation du principe actif en
microparticules isolées sur la polyvinylpyrrolidone, ce qui
20   évite les problèmes de mauvais mouillage du solide et de
réagglomération des particules. L'article "Stable Solid
Dispersion System Against Humidity", par Kuchiki et al,
Yakuzaigaku, 44, No.1, 31-37 (1984) décrit une telle
technique de préparation de dispersions solides utilisant de
25   la polyvinylpyrrolidone. Les quantités de PVP sont alors ici
très importantes, et les rapports principe actif sur PVP
sont compris entre 1/1 et 1/20. Dans ce cas cependant, il
n'y a pas de support inerte.

Cependant, rien dans l'état de la technique n'enseigne
30   ni ne suggère la présente invention.

Ainsi, la présente invention fournit une composition
comprenant:

(a) un support inerte hydrodispersible recouvert d'au moins
35   une couche contenant un principe actif fénofibrate sous
forme micronisée avec une taille inférieure à 10 μm, un
polymère hydrophile et éventuellement un tensio-actif; ledit
polymère hydrophile représentant au moins 10% en poids du
poids de l'élément a); et

4

5

(b) éventuellement une ou plusieurs phase(s) ou couche(s) externe(s).

Selon un mode de réalisation, un tensio-actif est présent avec le principe actif et le polymère hydrophile.

5    L'invention fournit aussi une composition comprenant un principe actif fénofibrate présentant une dissolution d'au moins 10% en 5 minutes, 20% en 10 minutes, 50% en 20 minutes et 75% en 30 minutes, telle que mesurée conformément à la méthode de la palette tournante à 75 t/min selon la

10   Pharmacopée Européenne, dans un milieu de dissolution constitué d'eau avec 2% en poids de polysorbate 80.

L'invention a encore pour objet un procédé de préparation d'une composition pharmaceutique selon l'une quelconque des revendications précédentes comprenant les

15   étapes de:

(a) préparation d'une suspension de fénofibrate sous forme micronisée avec une taille inférieure à 10 µm, dans une solution de polymère hydrophile et éventuellement de tensio-actif;

20   (b) application de la suspension de l'étape (a) sur un support inerte hydrodispersible;

(c) éventuellement enrobage des granulés ainsi obtenus par une ou plusieurs phase(s) ou couche(s).

L'étape (b) est mise en oeuvre de préférence dans un

25   granulateur à lit fluidisé.

Le procédé peut comporter une étape de compression des produits obtenus à l'étape (b) ou (c).

L'invention a encore pour objet une suspension de fénofibrate sous forme micronisée avec une taille inférieure

30   à 10 µm, dans une solution de polymère hydrophile et éventuellement de tensio-actif.

La présente invention est décrite plus en détail dans la description qui suit, en référence aux dessins annexés,

35   dans lesquels:

- la figure 1 est une représentation graphique d'une étude comparative du profil de dissolution d'une composition selon la présente invention et de celui du Lipanthyl M ®;

6

-la figure 2 est une représentation graphique d'une étude comparative du profil de dissolution d'une composition selon la présente invention et de celui de produits pharmaceutiques disponibles sur le marché allemand;

5  -la figure 3 représente le profil de dissolution d'une composition selon la présente invention contenant du glipizide; et

-la figure 4 représente le profil de dissolution d'une composition selon la présente invention contenant de la 10 nifédipine.

Le terme "principe actif" est utilisé dans le cadre de la présente invention dans son sens classique et recouvre donc toute substance présentant une activité 15 pharmacologique, thérapeutique etc, quelconque. Les compositions selon la présente invention sont particulièrement appropriées, du fait de leur profil de dissolution amélioré, à l'administration d'un principe actif présentant une faible solubilité. Ce dernier terme peut 20 s'entendre, dans le cadre de la présente invention, comme un principe actif ayant une solubilité inférieure à 1% en poids dans l'eau pure (ou une solubilité inférieure à 10% dans un milieu de dissolution constitué d'eau additionnée de 2% de Polysorbate 80). Le test de solubilité est mis en oeuvre 25 conformément à la méthode de la palette tournante selon la Pharmacopée Européenne. Des mélanges de principes actifs sont aussi appropriés.

Il est à la portée de l'homme de l'art de déterminer, à partir du test de solubilité mentionné ci-dessus, les 30 principes actifs qui peuvent être avantageusement utilisés dans le cadre de la présente invention.

On entend, dans le cadre de la présente invention, par l'expression "sous forme micronisée" une substance se trouvant sous une forme particulaire, la dimension des 35 particules étant inférieure ou égale à environ 10 μm.

Avantageusement, cette dimension est inférieure ou égale à 5μm.

On entend, dans le cadre de la présente invention par "support inerte hydrodispersible" tout excipient,

6

généralement hydrophile, pharmaceutiquement inerte, cristallin ou amorphe, sous une forme particulaire, ne conduisant pas à une réaction chimique dans les conditions opératoires utilisées, et qui est soluble dans un milieu aqueux, notamment en milieu acide gastrique, ou suffisamment hydrophile pour être facilement dispersible dans un tel milieu. Des exemples de tels excipients sont les dérivés de sucres, tels que lactose, saccharose, ou de la silice colloïdale, de l'amidon, de l'amidon hydrolysé (malto- dextrine), de la cellulose, etc.. Des mélanges sont aussi appropriés. La dimension particulaire unitaire du support inerte hydrodispersible peut être par exemple comprise entre 50 et 500 microns.

On entend, dans le cadre de la présente invention par "polymère hydrophile" toute substance de poids moléculaire élevé, (par exemple supérieur à 300) ayant une affinité suffisante pour l'eau pour s'y dissoudre ou y former un gel. Des exemples de tels polymères sont : polyvinylpyrrolidone, poly(alcool vinylique), hydroxypropylcellulose, hydroxy- méthylcellulose, hydroxypropylméthylcellulose, gélatine, etc.. Des mélanges de polymères sont aussi appropriés. Le polymère hydrophile préféré est la polyvinylpyrrolidone (PVP). La PVP utilisée dans le cadre de la présente invention présente par exemple un poids moléculaire compris entre 10 000 et 100 000, de préférence par exemple entre 20 000 et 55 000.

Le terme "tensio-actif" tel qu'utilisé dans le cadre de la présente invention est utilisé dans son sens classique. Tout tensio-actif peut être utilisé, qu'il soit amphotère, non-ionique, cationique ou anionique. Des exemples de tels tensio-actifs sont : sodium lauryl sulfate, monooléate, monolaurate, monopalmitate, monostéarate ou un autre ester de sorbitanne polyoxyéthyléné, dioctylsulfosuccinate de sodium (DOSS), lécithine, alcool stéarylique, alcool cétostéarylique, cholestérol, huile de ricin polyoxyéthylénée, glycérides d'acides gras polyoxyéthylénés, poloxamer®, etc.. Des mélanges de tensio-actif sont aussi appropriés.

Le tensio-actif préféré est le laurylsulfate de sodium.

7

*ι*

Les compositions selon l'invention peuvent en outre contenir tout excipient classiquement utilisé dans le domaine pharmaceutique et chimiquement compatible avec le principe actif, tels que les agents liants, les charges, les
5  pigments, les agents de désintégration, les lubrifiants, les agents mouillants, les tampons, etc. On peut citer à titre d'exemple de tels excipients utilisables dans la présente invention: cellulose microcristalline, lactose, amidon, silice colloïdale, talc, esters de glycérol, stéaryl
10 fumarate de sodium, dioxyde de titane, stéarate de magnésium, acide stéarique, polyvinyl pyrrolidone réticulée (AC DI SOL®), carboxyméthylamidon (Explotab®, Primojel®), hydroxypropyl-cellulose, hydroxyméthylcellulose, hydroxy-propylméthylcellulose, gélatine, etc..

15     On entend par "phase ou couche externe" dans le cadre de la présente invention tout revêtement sur l'élément (a) avec le principe actif (formant un "noyau"). En effet, il peut être intéressant de disposer une ou plusieurs phase(s) ou couche(s) au-dessus du noyau revêtu. L'invention couvre
20 ainsi un noyau unique avec une couche, mais aussi plusieurs noyaux dans une phase comme dans le cas de comprimés formés à partir de "noyaux" mélangés avec une phase.

    Cette couche externe comprend des excipients classiques.
25 Par exemple, une couche externe comprendra des agents de réaction alcalins, lorsque le principe actif sera par exemple acido-labile.

On pourra aussi disposer un revêtement entérique, la couche entérique correspondant à une couche entérosoluble et
30 gastrorésistante. Par exemple, la couche entérique peut être formée à partir de copolymère d'acide méthacrylique, tels que Eudragit®. La couche entérique peut être déposée sur une sous-couche intermédiaire.

On peut aussi disposer une couche comprenant des adjuvants
35 pour la fabrication de comprimés. Selon ce mode de réalisation, la couche externe comprend un agent de désintégration et par exemple un lubrifiant; les granulés ainsi recouverts et mélangés peuvent alors être facilement comprimés et se désintègrent facilement dans l'eau.

8

Les compositions selon la présente invention comprennent en général, par rapport au poids total de la composition hors phase ou couche externe, un support inerte hydrodispersible représentant de 10 à 90% en poids, de préférence 25 à 80% en poids, le principe actif représentant de 5 à 40% en poids, de préférence 10 à 40% en poids, le polymère hydrophile représentant de 10 à 60% en poids, de préférence 10 à 50% en poids, le tensio-actif représentant de 0 à 10% en poids, de préférence 0,1 à 3% en poids. La couche ou phase externe, s'il y en a une, peut représenter jusqu'à 80% en poids du poids total, de préférence jusqu'à 50% en poids.

Le rapport pondéral principe actif/polymère hydrosoluble peut être compris, par exemple entre 1/10 et 4/1, de préférence par exemple entre 1/2 et 2/1.

Quand un tensio-actif est utilisé, le rapport pondéral tensio-actif/polymère hydrosoluble peut être compris, par exemple entre 1/500 et 1/10, de préférence par exemple entre 1/100 et 5/100.

Selon un mode de réalisation, la composition selon la présente invention se présente sous la forme de comprimés.

Selon un autre mode de réalisation, la composition selon la présente invention se présente sous la forme de granulés enfermés dans une gélule, par exemple de gélatine.

Les compositions selon la présente invention sont particulièrement appropriées pour l'administration par voie orale des principes actifs.

La composition selon la présente invention est préparée par un nouveau procédé comprenant la pulvérisation sur les noyaux inertes d'une suspension de principe actif sous forme micronisée dans une solution d'un polymère hydrophile et éventuellement de tensio-actif.

Lorsqu'un tensio-actif est présent, le principe actif peut être co-micronisé avec le tensio-actif.

Le procédé selon l'invention consiste à utiliser le principe de la technique de granulation en lit fluidisé, mais avec des produits de départ spécifiques, afin d'aboutir à un profil de dissolution amélioré et ainsi à une

{ c

biodisponibilité élevée. En particulier, l'invention fait
emploi d'une suspension du principe actif micronisé dans une
solution d'un polymère hydrophile et éventuellement d'un
tensio-actif.

5    La technique de granulation en lit fluidisé est
largement utilisée dans l'industrie pharmaceutique pour
préparer des gélules ou des comprimés. De façon classique
selon l'art antérieur, une poudre ou un mélange de poudres
(principe actif + excipients) est mis en suspension en lit
10   fluidisé dans le granulateur, et une solution contenant un
liant et éventuellement un tensio-actif est pulvérisée sur
ce lit pour former des granulés. La technique de granulation
en lit fluidisé est bien connue de l'homme de l'art qui se
rapportera aux ouvrages de référence, par exemple à
15   l'ouvrage "Die Tablette", de Ritschel, Ed. Cantor Aulendorf,
pages 211-212.

L'invention, comme il a été indiqué, comprend la
pulvérisation sur un support inerte, d'une suspension de
principe actif micronisé avec un polymère hydrosoluble. A
20   l'issue de la granulation, le granulé qui est formé est
constitué de cristaux par ex. de lactose, isolés (ou
éventuellement agglomérés entre eux par la solution de PVP),
et des particules de principe actif et de PVP collés à la
surface des cristaux. Le granulé pourrait de même être
25   constitué de cristaux revêtus agglomérés entre eux, voire
même d'un tel agglomérat à nouveau revêtu.

Les compositions selon l'invention peuvent aussi être
préparées par d'autres procédés, par exemple par
pulvérisation de la solution de principe actif micronisé sur
30   le support inerte hydrodispersible.

Les granulés ainsi obtenus peuvent, si cela est
souhaité, être enrobé d'une couche externe ou compacté en
des comprimés ou former des agglomérats.

La ou les couche(s) externe(s) est(sont) appliquée(s)
35   par des techniques de revêtement classiques, telles que par
revêtement dans une cuve ou en lit fluidisé.

Lorsque le granulé obtenu (ultérieurement revêtu ou
non) est compacté pour former des comprimés, cette étape
peut être mise en oeuvre par toute technique classique

10

11

appropriée, par exemple sur machine à comprimer alternative
ou rotative.

Le produit de départ important est la suspension de
principe actif. Cette suspension est préparée par mise en
5  suspension du principe actif micronisé dans une solution,
comprenant le polymère hydrophile et éventuellement un agent
tensioactif en solution dans un solvant. Si un tensio-actif
est utilisé, il est mis en solution dans le solvant (bécher
+ agitateur magnétique ou agitateur à pales). Ensuite le
10  polymère hydrophile (PVP) est dispersé sous agitation dans
la solution précédemment obtenue. Selon la solubilité du
polymère, celui-ci se dissout dans la solution ou forme un
gel ou une suspension plus ou moins épais(se). Sous
agitation toujours, le principe actif micronisé est dispersé
15  en pluie dans la solution ou suspension précédente pour
former une suspension homogène. On peut intervertir l'ordre
de ces étapes. Le solvant utilisé peut être aqueux ou
organique (par exemple éthanol). On utilise par exemple de
l'eau déminéralisée.
20  La concentration en principe actif dans la suspension est de
1 à 40% en poids, de préférence 10 à 20%.
La concentration en polymère hydrophile dans la suspension
est de 1 à 40% en poids, de préférence 5 à 20%.
La concentration en tensio-actif dans la suspension est de
25  0 à 10% en poids, de préférence 1 à 5%.

L'invention a aussi pour objet cette nouvelle
suspension.

Sans vouloir être liée par une théorie, la demanderesse
pense que ce nouveau procédé, par l'utilisation d'une
30  suspension du principe actif micronisé dans une solution de
polymère hydrophile, permet l'obtention d'une composition
nouvelle dans laquelle le principe actif est sous forme non-
réagglomérée.

Les exemples suivants illustrent l'invention sans la
35  limiter.

11

/2/

<u>Exemple 1</u>   Préparation d'une composition pharmaceutique de
fénofibrate selon l'invention.

On prépare une composition contenant en tant qu'élément
a) du fénofibrate micronisé, de la Plasdone®, du Capsulac®
5  et du lauryl sulfate de sodium.

Le fénofibrate micronisé présente une dimension
particulaire d'environ 5µm, telle que mesurée à l'aide d'un
compteur Coulter.

Le Plasdone K25® correspond à une polyvinylpyrrolidone
10  PVP ISP et le Capsulac 60® correspond à un lactose
monohydrate à gros cristaux (taille de particules entre 100
et 400 µm) (MEGGLE).

Le laurylsulfate de sodium (7g) est dissous dans l'eau
(eau déminéralisée, 1750g) et le fénofibrate micronisé
15  (350g) est mis en suspension dans le mélange obtenu (par
exemple à l'aide d'un agitateur à hélice à 300 t/min,
pendant 10 minutes, puis à l'aide d'un agitateur
Ultra Turrax à 10 000 t/min, pendant 10 minutes). On ajoute
ensuite sous agitation la PVP (350g), l'agitation (agitateur
20  à hélice) étant poursuivie jusqu'à dissolution de cette
dernière (30 minutes). L'ensemble est passé sur un tamis
(taille 350 µm) pour éliminer d'éventuels agglomérats.

Séparément, le lactose (400g) est mis en suspension
dans un granulateur en lit d'air fluidisé (type Glatt®
25  GPCG1 - Top Spray ou équivalent) et on le porte à une
température de 40°C.

La suspension de fénofibrate est pulvérisée sur le
lactose.   Cette étape est réalisée dans les conditions
suivantes: pression de pulvérisation: 2,1 bar; débit d'air
30  70 m$^3$/h, température d'arrivée d'air: 45°C; température de
sortie d'air: 33°C; température produit: 34°C; durée de
pulvérisation: 3 h.

Le granulé ainsi obtenu peut être mis en gélules ou
transformé en comprimés.   Toute technique classique
35  appropriée de préparation de telles formulations galéniques
peut être utilisée.

Pour la transformation en comprimés, on ajoute à 191g
de granulés obtenus (par exemple à l'aide d'un mélangeur
type mélangeur-malaxeur, mélangeur planétaire, ou mélangeur

13

par retournement) la phase externe présentant la composition
suivante:
- 56g de Polyplasdone XL® (polyvinylpyrrolidone réticulée,
ISP, telle que décrite dans la pharmacopée US "USP - NF"
5  sous le nom de crospovidone, MW moyen > 1000000);
- 88g d'Avicel® PH200 (Cellulose microcristalline);
- 3,5g de stéaryl fumarate de sodium (Mendell, U.S.A.); et
- 2g d'Aerosil® 200 (silice colloïdale).
       La polyvinylpyrrolidone réticulée, la cellulose
10 microcristalline, le stéaryl fumarate de sodium et la silice
colloïdale sont des agents respectivement de désintégration,
liant, lubrifiant et d'écoulement.
       L'obtention du comprimé peut s'effectuer sur une
machine à comprimer alternative (p. ex Korsch EKO) ou
15 rotative (par ex. Fette Perfecta 2).
       On obtient ainsi des comprimés présentant la
composition suivante, exprimée en mg:
- élément (a) :
       Fénofibrate micronisé        100,0
20     PVP                          100,0
       Lactose                      114,3
       Laurylsulfate de sodium      2,0
- phase (ou couche) externe :
       PVP réticulée                92,7
25     Cellulose microcristalline   145,7
       Stéryl fumarate de sodium    5,8
       Silice colloïdale            3,3

       Exemple 2: Dissolution d'une composition selon l'invention
30 et d'une composition selon l'art antérieur.
a) milieu de dissolution et protocole pour la mesure de la
dissolution.
       On recherche un milieu de dissolution qui soit
discriminant, c'est-à-dire que deux produits ayant des
35 profils de dissolution très différents dans le suc gastrique
présenteront des courbes de dissolution très différentes; on
cherche ainsi à éliminer les incertitudes liées à un milieu
de dissolution du type solution aqueuse de laurylsulfate de
sodium à 0,1M (milieu trop peu discriminant).

14

On utilise à cette fin un milieu aqueux contenant un tensio-actif, à savoir le Polysorbate 80 (mono oléate de sorbitanne polyoxyéthyléné). Ce tensio-actif est facilement disponible auprès de plusieurs fournisseurs, fait l'objet
5  d'une monographie dans les pharmacopées, et est aisé à mettre en oeuvre (produit liquide soluble dans l'eau). D'autres tensioactifs peuvent également être utilisés.

On utilise la méthode de la palette tournante (Pharmacopée Européenne) dans les conditions suivantes:
10  volume du milieu: 1200 ml; température du milieu: 37°C; vitesse de rotation de la palette: 75 t/min; prélèvements: toutes les 2.5 minutes. La détermination de la quantité dissoute est effectuée par spectrophotométrie. Les essais sont répétés à 6 reprises.

15

b) résultats.

La composition selon l'invention consiste en deux comprimés dosés à 100 mg de fénofibrate environ, préparés selon l'exemple 1.
20  La composition selon l'art antérieur est du Lipanthyl M ® de Fournier, dosé à 200 mg de fénofibrate (correspondant à des gélules de fénofibrate micronisé dosées à 200mg et renfermant du laurylsulfate de sodium, du lactose, de l'amidon prégélatinisé de la
25  polyvinylpyrrolidone réticulée et du stéarate de magnésium, conformément à l'enseignement du brevet FR2627696).

Les résultats obtenus sont représentés graphiquement à la figure 1, sur laquelle sont indiqués le pourcentage de dissolution et entre parenthèses l'écart type observé.
30  Ces résultats montrent clairement que les compositions selon la présente invention présentent un profil de dissolution nettement supérieur à celui des compositions selon l'art antérieur.

Ces résultats montrent aussi clairement qu'avec les
35  compositions selon l'invention, l'écart type observé est nettement plus faible qu'avec les compositions selon l'art antérieur.

14

*15*

Exemple 3: Etude de la biodisponibilité des compositions selon la présente invention et de compositions selon l'art antérieur.

Un essai de biodisponibilité sur volontaires sains a
5  été mené.

Les compositions testées sont les suivantes :
- composition selon l'invention: des gélules contenant les granulés préparés selon l'exemple 1, et dosées à 200 mg de fénofibrate.
10 - première composition selon l'art antérieur: Lipanthyl M ® de Fournier, dosé à 200 mg de fénofibrate, identique à celle de l'exemple précédent.
- seconde composition selon l'art antérieur: Secalip ® en gélules (300 mg de fénofibrate sous forme de 3 gélules à
15 100mg).

L'étude a été réalisée sur 6 volontaires sains recevant une dose unique de fénofibrate, avec une période de repos de 6 jours minimum entre les administrations. Les échantillons pour analyse pharmacocinétique sont recueillis après chaque
20 administration au temps : 0,5; 1 h; 2 h; 3 h; 4 h; 5 h; 6 h; 8 h; 10 h; 12 h; 24 h; 36 h; 48 h; 72 h et 96 heures après la prise du médicament. La teneur en acide fénofibrique dans le plasma est mesurée sur chaque échantillon.

Les résultats obtenus sont donnés dans le tableau 1 ci-
25 dessous.

Tableau 1

| Produit | Dose (mg) | Cmax (µg/mL) | tmax (h) | t1/2 (h) | AUC 0-t (µg.h/ml) | AUC-∞ (µg.h/ml) |
|---------|-----------|--------------|----------|----------|-------------------|------------------|
| Invention | 200 | 5,4 | 6 | 23 | 148 | 162 |
| Secalip® 100 | 3 x 100 | 1,1 | 25 | 39 | 53 | 56 |
| Lipanthyl® | 200 | 1,6 | 8,3 | 41 | 71 | 92 |

30 Cmax: Concentration plasmatique maximale
tmax: temps nécessaire pour atteindre le Cmax
t1/2: Demi vie plasmatique

16

AUC 0- t: Aire Sous la Courbe de 0 à t
AUC 0 - ∞: Aire Sous la Courbe de 0 à l'∞

    Ces résultats montrent clairement que les compositions
5   selon la présente invention, présentant un profil de
    dissolution amélioré par rapport aux compositions de l'art
    antérieur, conduisent à une biodisponibilité du principe
    actif qui est nettement supérieure à celle obtenue dans le
    cas des compositions selon l'art antérieur.
10

    Exemple 4 Comparaison du profil de dissolution des
    compositions selon l'invention avec celui de produits
    actuellement sur le marché en Allemagne
        Sur le marché allemand on trouve des formulations de
15  fénofibrate à action immédiate ou à action prolongée. Comme
    en France, les formes à 100 & 300 mg (classiques) coexistent
    avec des formes à 67 et 200 mg (à biodisponibilité
    améliorée, selon l'enseignement du brevet FR2627696).
    Ces produits sont les suivants:
20

        Fénofibrate - ratiopharm; Ratiopharm - Ulm;
        Gélules;
        Composition: Fénofibrate 100 mg;
        Excipients: Lactose, amidon de maïs, stéarate de
25      magnésium, colorant E 171, gélatine.

        Durafenat; Durachemie - Wolfrathausen;
        Gélules;
        Composition: Fénofibrate 100 mg;
30      Excipient: Lactose, amidon de maïs, stéarate de
        magnésium, colorant E 171, gélatine.

        Normalip pro; Knoll - Ludwigshaffen;
        Gélules;
35      Composition: Fénofibrate 200 mg;
        Excipients: Crospovidone, gélatine, lactose
        monohydrate, stéarate de magnésium, amidon de maïs,
        laurylsulfate de sodium, colorants E 132 et E 171.

16

On effectue une comparaison entre:

- le comprimé selon l'invention tel que préparé selon l'exemple 1 (2 x 100 mg) ;
- le Normalip pro ® (200 mg);
5 - le Lipanthyl 200 M ® (200 mg) (selon l'exemple précédent);
- le Fénofibrate Ratiopharm® (2 x 100 mg);
- le Durafenat ® (2 x 100 mg).

Les tests sont mis en oeuvre dans les mêmes conditions que dans les exemples précédents. Les résultats sont 10 reportés figure 2.

Ces résultats montrent clairement que les compositions selon l'invention présentent une dissolution nettement améliorée par rapport aux compositions selon l'art antérieur.

15

Exemple 6 Préparation de compositions selon l'invention contenant d'autres dérivés de fibrates.

Des compositions selon la présente invention, dans lesquelles le fénofibrate est remplacé par du gemfibrosil, 20 du ciprofibrate, ou du bezafibrate, sont préparées selon le procédé de l'exemple 1. Les compositions sont identiques à celle donnée dans l'exemple 1, hormis le principe actif qui est varié.

Le profil de dissolution des compositions ainsi 25 obtenues est comparé à celui obtenu avec les préparations pharmaceutiques disponibles dans le commerce correspondantes suivantes:

Gemfibrosil (450 mg), comprimés LIPUR® - Parke Davis;
Ciprofibrate (500 mg), gélules, LIPANOR® - Sanofi Winthrop;
30 BI - LIPANOR® - 200 mg - Sanofi Winthrop;
Bezafibrate (200 mg), comprimés, BEZIFAL® - Lipha santé.

Les résultats des tests de dissolution réalisés selon l'exemple 2 montrent clairement que le profil de dissolution des compositions selon la présente invention est nettement 35 supérieur à celui obtenu avec les formulations galéniques correspondantes disponibles dans le commerce.

18

Exemple 7 Etude du profil de dissolution de composition selon la présente invention contenant d'autres classes de principe actif.

D'autres principes actifs, connus pour leur faible
5 solubilité, sont testés dans cet exemple à savoir: le glipizide et la nifédipine.

Les compositions selon l'invention (granulés) qui sont testées sont les suivantes (la suspension de principe actif étant effectuée dans 50,00 mg d'eau déminéralisée):
10 Composition 1:

|  |  |
|---|---|
| Glipizide | 10,00 mg |
| Plasdone K29-32® | 10,00 mg |
| Lactose EP D20® | 80,00 mg |

Composition 2:
15

|  |  |
|---|---|
| Nifédipine (5 µm) | 10,00 mg |
| Plasdone K29-32® | 15,00 mg |
| Lactose EP D20® | 80,00 mg |

Les compositions selon l'invention qui sont testées
20 sont préparées selon l'exemple 1, les différents composés étant présents en des quantités calculées pour 10 mg de principe actif glipizide ou nifédipine.

Ces compositions sont comparées aux principes actifs non traités. Les résultats des tests de dissolution
25 (réalisés selon le procédé de l'exemple 2) sont représentés graphiquement aux figures 3 et 4, respectivement pour les principes actifs glipizide ou la nifédipine.

Ces résultats montrent clairement que les compositions selon la présente invention présentent un profil de
30 dissolution amélioré par rapport aux principes actifs de départ non traités.

Des essais similaires réalisés sur d'autres principes actifs de faible solubilité, tels que la griséofulvine et la spironolactone conduisent à des résultats similaires
35 Bien entendu, la présente invention n'est pas limitée aux modes de réalisation décrits mais est susceptible de nombreuses variantes aisément accessibles à l'homme de l'art.

18

19

REVENDICATIONS.

1. Composition comprenant:

(a) un support inerte hydrodispersible recouvert d'au moins
5   une couche contenant un principe actif fénofibrate sous
forme micronisée avec une taille inférieure à 10 µm, un
polymère hydrophile et éventuellement un tensio-actif; ledit
polymère hydrophile représentant au moins 10% en poids du
poids de l'élément a); et

10   (b) éventuellement une ou plusieurs phase(s) ou couche(s)
externe(s).

2. Composition selon la revendication 1, dans laquelle un
tensio-actif est présent avec le principe actif et le
15   polymère hydrophile.

3. Composition selon la revendication 1 ou 2, dans laquelle
le polymère hydrophile est de la polyvinylpyrrolidone.

20   4. Composition selon la revendication 2 ou 3, dans laquelle
le principe actif et le tensio-actif sont co-micronisés.

5. Composition selon l'une quelconque des revendications 2 à
4, dans laquelle le tensio-actif est du laurylsulfate de
25   sodium.

6. Composition selon l'une quelconque des revendications
précédentes, dans laquelle par rapport au poids de l'élément
a), le support inerte hydrodispersible représente de 10 à
30   90% en poids, le principe actif représente de 5 à 50% en
poids, le polymère hydrophile représente de 10 à 60% en
poids, le tensio-actif représente de 0 à 10% en poids.

7. Composition selon la revendication 6, dans laquelle par
35   rapport au poids de l'élément a), le support inerte
hydrodispersible représente de 25 à 80% en poids, le
principe actif représente de 10 à 40% en poids, le polymère
hydrophile représente de 10 à 50% en poids, le tensio-actif
représente de 0,1 à 3% en poids.

8. Composition selon l'une quelconque des revendications précédentes, dans laquelle la dimension particulaire unitaire du support inerte hydrodispersible est comprise entre 50 et 500 microns.

5

9. Composition comprenant un principe actif fénofibrate présentant une dissolution d'au moins 10% en 5 minutes, 20% en 10 minutes, 50% en 20 minutes et 75% en 30 minutes, telle que mesurée conformément à la méthode de la palette
10   tournante à 75 t/min selon la Pharmacopée Européenne, dans un milieu de dissolution constitué d'eau avec 2% en poids de polysorbate 80.

10. Procédé de préparation d'une composition pharmaceutique
15   selon l'une quelconque des revendications précédentes comprenant les étapes de:
(a) préparation d'une suspension de fénofibrate sous forme micronisée avec une taille inférieure à 10 µm, dans une solution de polymère hydrophile et éventuellement de tensio-
20   actif;
(b) application de la suspension de l'étape (a) sur un support inerte hydrodispersible;
(c) éventuellement enrobage des granulés ainsi obtenus par une ou plusieurs phase(s) ou couche(s).
25

11. Procédé selon la revendication 10, dans lequel l'étape (b) est mise en oeuvre dans un granulateur à lit fluidisé.

12. Procédé selon la revendication 10 ou 11, comprenant
30   l'étape de compression des produits obtenus à l'étape (b) ou (c).

13. Suspension de fénofibrate sous forme micronisée avec une taille inférieure à 10 µm, dans une solution de polymère
35   hydrophile et éventuellement de tensio-actif.



FIG 1

FIG 2



····△···· Comprimés Invention (2x100mg).

——◆—— Normalip pro (200mg).

——□—— Lipanthyl 200M.

——✕—— Fenofibrat-ratiopharm (2x100mg).

——○—— Durafenat (2x100mg).

% dissous.

Temps (min).

2758459

3/4

FIG 3



% dissous

Temps (minutes)

- —△— Glipizide.
- —□— Granulé "Invention"

Page 1



FIG 4

2758459

**REPUBLIQUE FRANÇAISE**

INSTITUT NATIONAL
de la
**PROPRIETE INDUSTRIELLE**

**RAPPORT DE RECHERCHE**
**PRELIMINAIRE**
établi sur la base des dernières revendications
déposées avant le commencement de la recherche

Nº d'enregistrement
national

FA 537834
FR 9700479

| DOCUMENTS CONSIDERES COMME PERTINENTS | | Revendications concernées de la demande examinée |
|---|---|---|
| **Catégorie** | Citation du document avec indication, en cas de besoin, des parties pertinentes | |
| Y | EP 0 256 933 A (ETHYPHARM)<br>* le document en entier *<br>--- | 1-13 |
| Y | WO 82 01649 A (DESHORS)<br>* le document en entier *<br>--- | 1-13 |
| Y,D | EP 0 330 532 A (FOURNIER)<br>* le document en entier *<br>--- | 1-13 |
| Y,D | EP 0 519 144 A (ILSAN ILAC VE HAMMADDELERI SANAYI A.S.)<br>* le document en entier *<br>----- | 1-13 |

**DOMAINES TECHNIQUES RECHERCHES (Int.Cl.6)**

A61K

1

| Date d'achèvement de la recherche | Examinateur |
|---|---|
| 23 septembre 1997 | Scarponi, U |

EPO FORM 1503 03.82 (P04C13)

**CATEGORIE DES DOCUMENTS CITES**

X : particulièrement pertinent à lui seul
Y : particulièrement pertinent en combinaison avec un
   autre document de la même catégorie
A : pertinent à l'encontre d'au moins une revendication
   ou arrière-plan technologique général
O : divulgation non-écrite
P : document intercalaire

T : théorie ou principe à la base de l'invention
E : document de brevet bénéficiant d'une date antérieure
   à la date de dépôt et qui n'a été publié qu'à cette date
   de dépôt ou qu'à une date postérieure.
D : cité dans la demande
L : cité pour d'autres raisons
...........................................................................
& : membre de la même famille, document correspondant